IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION

**LAURA KANE,**

    **Plaintiff**                                               No. 13-5145

    v.

**COUNTY OF NORTHAMPTON and**        **JURY TRIAL DEMANDED**

**ARNOLD M. MATOS,**

    **Defendants**

## AMENDED COMPLAINT

AND NOW, comes Plaintiff, Laura Kane, by and through her undersigned counsel, and hereby avers as follows:

1. Plaintiff is Laura Kane, an adult individual who currently resides at 16 Cobblestone Drive, Easton, Northampton County, Pennsylvania, 18045.

2. Defendant is County of Northampton, with offices located at 669 Washington Street, Easton, Pennsylvania 18042. Individual Defendant Arnold M. Matos is the Director of the Defendant's prison system. Plaintiff, Laura Kane, has been an employee of Northampton County, Pennsylvania for over five years. Defendant Matos is being sued in his individual capacity for perpetrating and allowing the perpetration of the discriminatory acts cited in this Amended Complaint.

3. Plaintiff was hired in March 2008 as a Corrections Officer in the Northampton County Prison.

4. On January 13, 2010, Plaintiff was notified that she scored first place on the competitive examination for Corrections Supervisor (a Lieutenant position).

5. Plaintiff was not, however, hired as a Lieutenant at that time.

6. On April 28, 2010, Kane was notified that she had scored second on the competitive examination for Corrections supervisor (a Lieutenant position).

7. The male who scored first on the said exam informed the Plaintiff that he was not interested in the position.

8. This caused the Plaintiff to then become the number one applicant on the eligibility list. However, she was not hired as a Lieutenant at that time.

9. At some point after not being selected for the Lieutenant position after being ranked the #1 officer for the job for the 2nd time, the Plaintiff was approached by Officer Albert Hartrum. Hartrum stated to the Plaintiff that he and Captain James Kostura belong to the same gym. Hartrum stated that the Captain approached him and suggested that he apply for a Lieutenant position. Hartrum replied, "After what they did to Kane? No way." Hartrum stated that Captain James Kostura informed him that Kane was not selected for the Lieutenant position due to "underlying reasons."

10. On July 13, 2012, Kane was notified that she had scored in first place on the competitive examination for Corrections Supervisor (a Lieutenant position).

11. Warden Todd Buskirk summoned Plaintiff into his office a relatively short time after the scores were released. He informed her that her score of 93 was "mediocre" and that the hiring of a lieutenant isn't based completely on the test score. Rather, there "are politics involved." Deputy Warden David Penchishen was present for this conversation. Plaintiff was

informed by Buskirk if anyone were to question why she was in his office, to tell them they were discussing the new satellite facility in West Easton.

12. Plaintiff was finally, after two prior attempts, hired as a Shift Supervisor (Lieutenant) on September 16, 2012.

13. Plaintiff's probationary period was set to expire on March 16, 2013.

14. In January of 2013, Plaintiff was issued a "Performance Action Report" ("PAR.)

15. The PAR had a numeric rating system, of which Plaintiff was given an overall rating of 31.

16. On March 15, 2013, Plaintiff was issued a "Performance Action Report" ("PAR").

17. The PAR had a numeric rating system, of which Plaintiff was again given an overall rating of 31.

18. According to the PAR, a score of 28-31 "Meets Job Expectations".

19. The two performance appraisals should have been more than adequate to allow Plaintiff to be taken off her probation.

20. Instead, Captain James C. Kostura, Operations Administrator, with the approval of Director Arnold M. Matos, decided to "extend" Kane's probation until June 16, 2013.

21. Plaintiff was told that she had to complete "future training" in a course entitled: "Ladies in Law Enforcement".

22. The Plaintiff completed what the Captain referred to as "Ladies in Law Enforcement." The actual name of the training was: "Women's Leadership Conference."

23. When Plaintiff attended the training at Penn State, she was made to drive back to the Prison the final day of the training after 8 hours of training and was not compensated.

24. Plaintiff asked twice if she could stay overnight and be allowed a travel day as every other Lieutenant is permitted to do when attending training which exceeds 8 hours. Instead, Plaintiff

was instructed she had to drive 180 miles that night after training and would not be paid for the extra three to four hours of time she put in.  "SCHOOL is out at 5.  Drive home afterward," the Captain stated to her in an email.

25. Then, in a Memorandum issued on June 12, 2013, Plaintiff's probation was extended to July 16, 2013.

26.  According to the Memorandum, the extension was due to her absence during a planned and approved family vacation as well as a week-long training with several other Lieutenants.

27.  When the Captain explained to the Plaintiff that her probation was being extended once again, James Kostura stated to the Plaintiff that, "I'm going to bat for you, so if you go against me, Im gonna be pissed."

28.  At no point during any of these extensions, was the Plaintiff notified that her seniority would be jeopardized.

29. These extensions were based completely on subjective standards, rather than objective standards.

30. In Captain Kostura's June 12, 2013 Memorandum, he stated that Plaintiff has a "strong work ethic" and, that "her work integrity is exemplary".

31. However, Plaintiff was ruled to be deficient on "IPC Skills", i.e., inter-personal skills.

32.  Pursuant to the first Performance Action Report, the Captain pledged in writing to meet with the Plaintiff a minimum of twice a week for help with IPC skills.  This never occurred.

33.  Plaintiff asked both Operations Administrator Al Crivellaro and the Captain for specifics, "something concrete," that she could work on, and they would not provide her with any.

34. Plaintiff believes that in the male-dominated culture of the prison administration, she, as a strong-willed female, is viewed as a threat to the male supervisory structure.

35. In fact, she was told by female Corrections Officer, Liza Shankar, that Corrections Officer Tomas R. Cora, President, A.F.S.C.M.E. Local 2549, stated that, "With a woman like that running the prison, what do we have a union for?"

36. Plaintiff was subjected to derisive and derogatory comments.

37. For example, Captain James C. Kostura stated to her: "did you take your medication today?"

38. Plaintiff was also required to attend EAP because she was found to be crying over the fact that she was being treated in a blatantly discriminatory fashion by her superiors.

39.  When being reminded by Operations Administrator Al Crivellaro not to forget her appointment, he remarked, "Don't worry.  I'm crazy, too."

40.  The Plaintiff was informed repeatedly by the EAP counselor, Faust Ruggiero, that he spoke to Warden Todd Buskirk, who informed him that the Plaintiff's situation at work was "definitely a union thing" and that they are "after [the Plaintiff.]"  Ruggiero also informed Kane that "men do not like taking orders from women."

41.  The Plaintiff was instructed by Ruggiero that she must perform her job "without emotion."  Otherwise, "they will think the girlie-girl can't do her job."

42.  Kane was instructed by Ruggiero not to email the other Lieutenants because she was "making them look bad," and it was upsetting them.

43. Plaintiff reported to her superiors that she was being savagely slandered on a Facebook site known as: "South Side Easton, Pa".

44. This Facebook site contained information that obviously was gleaned from a cooperative source within the prison.

45.  She provided the Captain with a copy of the slanderous letter and he informed her, "I already knew about that."

46. A courthouse employee contacted the Front Office/Records department to notify them of the letter as well. Director Matos was summoned to Administrator Robin Stanley's office, viewed the letter, shrugged his shoulders and stated, "It's a public website."

47. Officer Gibson approached the Plaintiff about the Facebook letter, stating, "I want you to hear this from the horse's mouth," and proceeded to inform her that Gibson's mother allegedly logged onto Gibson's Facebook page and "shared" the letter on Gibson's Facebook page without her knowledge.

48. When the Plaintiff chose to discipline the Vice President of the Union by filing paperwork and escorting him out of the prison for showing her disrespect in her position as a Lieutenant, Union President Officer Cora entered the Lieutenants' Office and stated to the Plaintiff, "If you don't work with us, we'll work against you." This statement was made in the presence of Lt. Mark Lambert, as well as the Plaintiff.

49. The Plaintiff notified Captain Kostura of the comment made by Union President Officer Cora. The Captain stated, "I don't like how that sounds. It's a threat."

50. The Plaintiff was summoned to Al Crivellaro's office regarding this situation. He stated, "I'm not going to let these other Lieutenants let you hang out to dry. And don't stick up for them either. They don't stick up for you. Lambert's incident report did not support you."

51. On June 20, 2013, Plaintiff was informed that she was being demoted to the position of Corrections Officer.

52. At that time, Plaintiff was informed that her seniority would be "pushed back by eight months" by Captain Kostura.

53. According to the Collective Bargaining Agreement "CBA" any employee who leaves the bargaining unit for more than six months can lose all seniority. During these improper

"extensions" of her probation referred to above, Plaintiff was advised that she would be "pushed back eight months", but then this was then changed to a complete loss of all seniority.

54. Plaintiff was never officially told of her complete loss of seniority. Plaintiff discovered this through the newest version of the seniority roster which was generated by another officer and forwarded to the entire Department of Corrections.

55. At that point, Captain Kostura was contacted about this discrepancy by the Plaintiff and his response to the Plaintiff was, "Yes, I am trying to hook up with you, see me today. Information has changed since I talked to you."

56. Seniority was taken in entirety from the Plaintiff on the day of her demotion (6/20/13) and not returned until the Plaintiff's federal lawsuit became known to the Defendants (9/24/13.)

57. Work assignments and mandations were a direct reflection of her place on the seniority roster, which was the lowest in the prison.

58. There were new officers shadowing (not even allowed to carry keys) with more seniority than the Plaintiff.

59. The union has been instructed to correct the Plaintiff's seniority on the roster, but they refuse to do so.

60. There are now two different seniority lists; the one posted in the prison by the union is still not correct.

61. Plaintiff pointed out to her superiors that a male corrections officer, Officer Albert, left Local 2549 for over six months to work in the Parks Department, and when he returned, he was placed back in the same position of seniority that he held prior to his departure.

62. Plaintiff spoke with Patricia Siemiontkowski on 7/8/13 in the Defendant's Human Resources Office, and was told that she would be given back her seniority.

63. The Defendant's Human Resources Department was fully aware of the inappropriate extension of her probationary period.

64. The incident that led to the Plaintiff being removed from her Lieutenant position involved an instruction that the Plaintiff gave to a female corrections officer to remove trash from a certain location.

65. The trash has to be removed with a forklift, and only certain officers are qualified to operate a forklift.

66. The officer given this instruction by the Plaintiff happened to be certified to operate a forklift.

67. When the Plaintiff attempted to enforce this instruction, the corrections officer complained to another Lieutenant and a superior about the Plaintiff's directive.

68. Instead of backing up the Plaintiff and disciplining this corrections officer for blatant insubordination, the prison management decided to turn this incident against the Plaintiff, to perpetuate the false notion that the Plaintiff "lacks interpersonal skills".

69. Plaintiff believes she was set up in this instance, in order to provide the ostensible justification for removing her from her Lieutenant's position.

70. The two Lieutenants (David Collins and Nathan Stahlnecker) who were present for the incident and the ensuing phone call that the Plaintiff made to the Captain were the ones who had urged her to contact the Captain and explain to the Captain how she felt.

71. Both Lt. Collins and Lt. Stahlnecker stated to the Plaintiff that they agreed with the her, and Lt. Collins gave the Plaintiff the Captain's phone number because the Captain just left the prison. Both Collins and Stahlnecker stated, "You should call him to let him know how you

feel." Plaintiff immediately called the Captain and was forced to leave a message when he did not answer his phone.

72. Plaintiff left a brief, tearful message (in front of the other two Lieutenants) and tried to explain how she felt humiliated, embarrassed, and how she felt she was undermined for her attempts to follow protocol. There was nothing disrespectful or inappropriate about the message.

73. The following day, Plaintiff was informed by the Warden that she had "challenged" the Captain.

74. Plaintiff was demoted for "challenging the Captain" by contacting him via telephone after being urged to do so by her fellow Lieutenants regarding his failure to support an order she gave to an officer.

75. However, Lt. Jason Rosati was found guilty of harassing and sexually confronting a female officer (Liza Shankar) in a hearing he was given in the prison. As a punishment, he was suspended one day.

76. Liza Shankar no longer works as an officer, but has informed the Plaintiff she would gladly testify about this in court.

77. Plaintiff alleges that over the last three years, she has been subjected to ongoing acts of discrimination because she is a female who is attempting to ascend to a management position in the prison.

78. On June 20th, in the Director's office with an audience, Warden Buskirk attempted to get the Plaintiff to resign and/or quit her position, in the Plaintiff's opinion.

79. Two or three days before this, however, Buskirk had called the Plaintiff into his office in private and told the Plaintiff to "stay strong" and that she was a "good Lieutenant." He stated he

was one of the few people in her corner and when this was over, he would "take care of a few union members" because he does not like how they have been handling business.

80. When the Plaintiff failed to resign and/or quit her position, she was demoted. She was criticized that she "couldn't get the officers to run through the brick wall." She was informed that the officers "didn't respect her position." Director Matos stated that the Plaintiff was "out of it."

81. Plaintiff was never given the opportunity to read, let alone sign, the demotion paperwork. Plaintiff had to retrieve a copy from Human Resources

82. Aside from the Plaintiff, since the prison's construction in 1861, one female, who happens to be African American, has been hired as a lieutenant. Plaintiff views this hiring as something done to meet racial diversity requirements, not gender equality.

83. Director Matos was aware of a series of anonymous letters written by the Union and sent to Human Resources. The letters included a significant amount of name-calling and threats. Plaintiff was told by Director Matos, in the presence Dave Penchishen and Al Crivellaro, to keep the letters to herself.

84. An individual hacked into Plaintiff's Facebook account and changed her status to FORMER Lieutenant at DOC.

85. Plaintiff informed Deputy Warden Penchishen that there was a Facebook site entitled "Northampton County Prison is the Worst Place Ever to Work" and there were insulting things posted about her on it and the response she got was laughter.

86. Plaintiff informed Matos through an investigatory referral that an officer wrote a disrespectful and threatening note in the passdown log of one of the housing units: "DON'T CARE KANE, YOU'LL BE FIRED SOON.". This log is accessible to staff only. Several

lieutenants were made aware of the threatening comment directed toward her in the logbook, but no one would remove the log from the housing unit while Plaintiff was at training for the week.

87. After the Plaintiff's demotion, on 9/18/13, she was notified she would be attending IPC training.  While waiting for the training to commence, Training Officer DeMarco entered the all-male (except for Plaintiff) training center  and stated, "It smells like French Whore in here," highly offending the Plaintiff.  This was communicated to all through an incident report. No action was taken against DeMarco.

88. Plaintiff was the only lieutenant who was unable to discipline an officer without prior submission and approval of paperwork by Al Crivellaro. This paperwork often caused a commotion. Crivellaro stated to Plaintiff that she was "nitpicking" and that "the other lieutenants don't see any of this stuff."

89. Plaintiff was the only lieutenant not allowed to call out sick.   As a lieutenant, she had perfect attendance. She attempted to call-out sick one Monday and was informed by the Captain that: "It's too early in the year to be sick". Although the Plaintiff had a surfeit of sick time, she was not allowed to use it.

90. When hired for the position of lieutenant, Plaintiff was informed that the lieutenants arrive at 4:30 for 1st shift, 1230 for 2nd shift, and 2030 for 3rd shift. Two male Lieutenants arrived late almost daily, forcing the Lieutenants from the previous shift to remain late waiting for their relief.

91. When Lt. Franklin Longenbach was placed on 3rd shift, Plaintiff had to sit and wait for him to arrive late each night.  She commented to him about this twice but it did not alter his behavior.

92. Longenbach arrived late one particular evening and Plaintiff told him to mark her down for 10 minutes of overtime.  He became angry and refused to mark it on the sheet so Plaintiff

marked it herself. The Captain pulled her aside the following day and told her that we all "have to be on the same page" and that "upstairs" doesn't like to see stuff like that (Kane ten minutes of overtime).

93. Lt. David Collins repeatedly told Plaintiff that he was the only lieutenant who was willing to work with her and it's "by no great coincidence that we are partners." Lt. Collins also commented many times that, "A woman has to work twice as hard as a man to get respect."

94. Lt. Conrad Lamont informed Plaintiff at least twice while she was an officer, that he was told to "do paperwork" on her. He told Plaintiff that he responded to these suggestions, "She doesn't do anything wrong."

95. In 2012, Plaintiff signed up to be a transport Officer. The list was re-written and Plaintiff's name was removed. Plaintiff emailed highly placed members in administration and her name was added to the list once again.

96. The Plaintiff signed up for the FERT team (fire emergency response team) but was not chosen. There are no females on the FERT team.

97. Plaintiff signed up to be a training officer, but was not chosen.

98. Plaintiff signed up for the CERT team. To do so she had to pass a physical exam. When Plaintiff took the exam she was told she had to bench 85% by Lt. Rosati who lied. In reality, female applicants had to bench 65%.

99. Plaintiff signed up for the honor guard but was not chosen.

100. The Plaintiff believes, and therefore avers, that her long standing position in the Prison is being affected adversely due to the fact that she is female, as enumerated hereinabove.

101. The Plaintiff was denied promotions and advancement at the Prison due to her gender.

102. Plaintiff is seeking damages due to loss of seniority, had to seek psychiatric services, and damages to personal relationships due to the mental toll the Defendant has placed upon her through humiliation and demotion in the workplace, due to a hostile work environment. By reason of the malicious want and will conduct of the Defendant, the Plaintiff demands punitive damages.

## COUNT I

**PLAINTIFF KANE V. COUNTY OF NORTHAMPTON AND ARNOLD M. MATOS VIOLATION OF 42 U.S.C. SECTION 1983 EQUAL PROTECTION VIOLATIONS UNDER THE FOURTEENTH AMENDMENT**

103. The Plaintiff incorporates herein by reference thereto paragraphs 1 through 102 as if the same were more fully set forth at length herein.

104. The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

105. This provision keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" Keystone Redevelopment Partners, LLC v. Decker, 631 F.3d 89, 109 (3d Cir. 2011) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992)).

106. The Fourteenth Amendment's Equal Protection Clause admonishes that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

107. Plaintiff avers that the Defendants intentionally discriminated against her because she is in the protected class of female, thus depriving her of her right to equal protection.

108. To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against him because of his membership in a protected class. See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009).

109. Plaintiff's classification as the only Caucasian female lieutenant warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic.

110. The Equal Protection Clause has been violated because the classification applied to the Plaintiff does not rationally further a legitimate state interest. Nordlinger, 505 U.S. at 10. As stated above, Plaintiff is in a suspect class.

111. The Defendants treated the Plaintiff differently from others similarly situated, (2) the defendants did so intentionally, and (3) there was no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).

WHEREFORE, the Plaintiff respectfully requests this Honorable Court to enter a judgment against the Defendants, jointly and severally, including the following demand for relief:

a) That the Court, after trial by jury, award the Plaintiff damages for all injuries incurred by reason of the Defendant's wrongful actions, including damages for emotional distress and for pain and suffering;

b) That the Court award the Plaintiff her attorney's fees and costs; and

c) That the Court award punitive damages against Defendant Arnold Matos.

d) That the Court award any other appropriate relief.

## COUNT II

**PLAINTIFF KANE V. COUNTY OF NORTHAMPTON AND ARNOLD M. MATOS**

**VIOLATION OF 42 U.S.C. SECTION 1983 PROCEDURAL DUE PROCESS VIOLATIONS**

112. The Plaintiff incorporates herein by reference thereto paragraphs 1 through 111 as if the same were more fully set forth at length herein.

113. Plaintiff believes, and therefore avers, that she was unlawfully stripped of her seniority by the Defendants.

114. Plaintiff believes, and therefore avers, that not only was she was unlawfully stripped of her seniority by the Defendants, but that this fact was concealed from her during the time period in which her probation was being "extended".

115. Plaintiff has a property interest in her job, based upon a collective bargaining agreement.

116. Plaintiff believes, and therefore avers, that Defendants denied her property rights without due process of law in violation of the Fourteenth Amendment of the United States Commission by stripping her of seniority in her employment, and by failing to give her a hearing on the issue of her seniority.

117. At all times, Defendants acted under the color of state law.

118. Individual Defendant Matos is the primary decision-maker at the prison and, as enumerated hereinabove, he has encouraged an invidious, misogynistic prison culture that has vexed the Plaintiff throughout the period referenced herein. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (explaining that a government „policy" can be established "when a „decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict," and that "[a] course of conduct is considered to be a „custom" when, though not authorized by law, „such practices of state officials [are] so permanent and well settled" as to virtually constitute law." )

119. By reason of the loss of her seniority and the failure to be afforded due process, Plaintiff lost wages and other compensation and has suffered embarrassment, humiliation, mental anguish and loss of self-esteem.

120. Plaintiff has been deprived of an opportunity to obtain all of the career benefits available to her as a prison officer pursuant to state law, the applicable collective bargaining agreement, and the Northampton County personnel policies and procedures.

121. The Plaintiff has sought the assistance of her Human Resources department regarding matters she was experiencing, but her appeals do not appear to have been taken seriously.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court to enter a judgment against the Defendants, jointly and severally, including the following demand for relief:

a) That the Court, after trial by jury, award the Plaintiff damages for all injuries incurred by reason of the Defendant's wrongful actions, including damages for emotional distress and for pain and suffering;

b) That the Court award punitive damages against Defendant Arnold Matos.

c) That the Court award any other appropriate relief.

d) Damages to the Plaintiff to compensate Plaintiff for loss of opportunity, pain, suffering, or other damage duly proved to have been suffered by Plaintiff because of Defendant's unlawful conduct;

e) Punitive damages against the individual defendant calculated to be sufficient to deter such misconduct in the future;

f) An award of interest on the above amounts of unpaid wages illegally denied;

g) The cost of this action and a reasonable attorney's fee paid to the Plaintiff;

h) Any other relief, equitable or legal, appropriate to remedy the illegal treatment of the Plaintiff by the Defendant; and,

i) The Plaintiff demands a jury trial.

                Respectfully submitted,
                */s/ Donald P. Russo* ____
DONALD P. RUSSO, ESQUIRE Attorney for Plaintiff
Law Offices of Donald P. Russo
35 E. Elizabeth Avenue, Suite 42 Bethlehem, Pa. 18018
(610) 954-8093
Attorney I.D. No. 25873